```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                        :
 In Re: LYONDELL CHEMICAL CO., et al.   :
                                        :
                       Debtors,         :
---------------------------------------:        16cv518 (DLC)
                                        :
EDWARD S. WEISFELNER, as Litigation     :        OPINION & ORDER
Trustee of the LB Litigation Trust      :
                                        :
                       Trustee,         :
                                        :
             -v-                        :
                                        :
HOFMANN, et al.                         :
                       Shareholders.    :
                                        :
---------------------------------------X
```

APPEARANCES

<u>For Trustee:</u>

Sigmund S. Wissner-Gross
May Orenstein
Marek P. Krzyzowski
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111

<u>For Shareholders:</u>

Philip D. Anker
Ross E. Firsenbaum
Hanna Baek
WILMER CUTLER PICKERING HALE & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

1

Ari J. Savitzky
WILMER CUTLER PICKERING HALE & DORR LLP
1975 Pennsylvania Avenue NW
Washington, DC 20006

DENISE COTE, District Judge:

Roughly one year after its 2007 leveraged buyout ("LBO"),
Lyondell Chemical Company ("Lyondell") filed a petition for
chapter 11 relief.  In this appeal from decisions of the
bankruptcy court, Lyondell's unsecured creditors, through their
trustee Edward S. Weisfelner (the "Trustee"), ask for
reinstatement of their claim that Lyondell engaged in an
intentional fraudulent transfer in connection with the LBO.  The
claim, which is brought pursuant to 11 U.S.C. § 548(a)(1)(A),
seeks to claw back approximately $6.3 billion in distributions
made to Lyondell shareholders (the "Shareholders") through the
LBO.

On appeal, the parties principally dispute two issues.
They are: whether the fraudulent intent of Lyondell's CEO may be
imputed to Lyondell, and what standard applies in determining
the existence of "actual intent" to defraud.  For the following
reasons, the intentional fraudulent transfer claim is
reinstated.

<u>**BACKGROUND**</u>

The following facts are taken from the Second Amended
Complaint (the "SAC").  In brief, the Trustee contends that Dan

Smith ("Smith"), Lyondell's CEO and Chairman of the Lyondell Board of Directors (the "Board"), knowingly presented false financial projections to the Lyondell Board when it was considering the LBO, and that in using those projections to urge adoption of the LBO, Smith had the actual intent to defraud Lyondell's creditors by stripping the company of assets in order to enrich himself and other Lyondell shareholders.

Lyondell was a large publicly-traded petrochemicals company based in the United States.  Lyondell's Board consisted of Smith and ten outside directors.  The financials that Smith presented to the Board at the time of the LBO contained allegedly false projections about the operations of Lyondell's oil refinery on the Gulf Coast near Houston, Texas (the "Houston Refinery").

For roughly thirteen years, Lyondell had operated the Houston Refinery as a joint venture between Lyondell and CITGO Petroleum Corporation, supplying crude oil at a fixed price. But, in 2006, Lyondell purchased a 100% stake in the Houston Refinery.  The acquisition exposed Lyondell for the first time to the full market force of the prices for crude and for petroleum products.

**Blavatnik's August 2006 Offer at $28.50**

While Lyondell was acquiring the Houston Refinery, Leonard Blavatnik ("Blavatnik"), an active investor in heavy industry and commodities, identified Lyondell as a potential acquisition

target.  Blavatnik made his first formal offer for Lyondell in August 2006, at a price of $26.50 to $28.50 per share.  Smith instructed the Board to reject this offer and to wait until he presented a "strategic update" in October 2006 before considering any merger.  The Board rejected Blavatnik's offer.

**2007 Long Range Plan**

The October 2006 strategic update, which was presented to the Board, included management projections of approximately $14.9 billion in earnings before interest, tax, depreciation, and amortization ("EBITDA") from 2007 to 2011.  The SAC alleges that these projections were inflated by over $5 billion to justify a higher value for Lyondell stock in any future acquisition.  Despite having information indicating that the projections were grossly inflated, the Board adopted Smith's projections as part of Lyondell's 2007 Long Range Plan ("2007 LRP") in December 2006.  In 2007, Lyondell's actual revenues fell short of the projections for that year in the 2007 LRP.

**Smith's May 2007 Disparagement of an LBO**

On May 9, 2007, Smith spoke at a conference in Las Vegas about the impact of an LBO on Lyondell creditors.  He stated that an LBO could "enrich the shareholders" but have a different impact on creditors.  Specifically, "[i]f you're a bondholder, I am not sure you get enriched in that situation.  If you think you are going to have a down cycle in the chemical markets, I

4

don't think you want to add $8 billion, $10 billion debt to this
and live through that."[1]

**Creation of "Refreshed" EBITDA Figures**

On May 11, 2007, Blavatnik announced that he had acquired a
"toehold" of approximately 10% of Lyondell stock and was
interested in acquiring the rest of Lyondell.[2]  That same day,
Robert Salvin, Lyondell's Manager of Portfolio Planning in its
Corporate Development Group, was told that Smith was "going to
want to take another look" at the LRP.  On May 15, Smith
instructed Salvin to come up with a set of "refreshed" annual
refining EBITDA projections for 2007 to 2011.  Salvin's notes of
his meeting with Smith contain the numbers "1.5-1.6B" and the
word "Refining."  The SAC alleges that Salvin thereafter
improperly added almost $2 billion of additional total company
EBITDA to the 2007 LRP on Smith's instructions.  This increase
came from a manipulation of the projections for the EBITDA for
refining operations.  In "refreshed" projections, the refining

---

[1]  In their opposition to this appeal, the Shareholders contend
that Smith's remarks in May 2007 about a potential LBO have
little relevance to the Lyondell LBO, which occurred two months
later.

[2] Blavatnik's announcement was made in a Schedule 13D filed with
the U.S. Securities and Exchange Commission.  A Schedule 13D
must be submitted by anyone who acquires beneficial ownership of
more than 5% in any class of publicly traded securities.  17
C.F.R. § 240.13d-1.

EBITDA was increased to a flat $1.6 billion for four years and
to $1.3 billion for the last year covered by the 2007 LRP.[3]

Smith began a series of private negotiations on June 7,
2007 with Blavatnik and his representatives.  Smith suggested a
purchase price of $48 per share.  On July 9, Blavatnik raised
his offer for Lyondell from $40 per share to $48, on the
condition that Lyondell sign an agreement by July 16, 2007 and
agree to a $400 million break-up fee.  Blavatnik gave Smith
until July 11 to respond.

On July 10, Smith reported to the Board on his discussions
with Blavatnik.  The Board was provided with the "refreshed"
projections reflecting the "current" view of management, which
showed that Lyondell would earn almost $2 billion more than had
been projected in the 2007 LRP.  The new analysis was discussed
and compared with the materially lower 2007 LRP.  Smith
explained to the Board that Blavatnik would sign a merger
agreement after only a couple of days of due diligence and, once
signed, there would be no "out" based on information discovered
after-the-fact.  The Lyondell Board authorized management to
continue the discussions with Blavatnik.

The SAC asserts that the Board knew that the new
projections were "inflated, unreasonable, and unachievable" and

---

[3] In one version, the refinery EBITDA was increased to a flat
$1.6 billion for each of the five years in the 2007 LRP.

had been developed to generate a higher valuation of Lyondell for the merger.  For example, the Board had copies of the Spring 2007 ratings agency presentation that Smith had made weeks earlier, which had adjusted the 2007 LRP downward due to Lyondell's poor first quarter performance in 2007.  The Board also knew that short term results from a refinery's operations are volatile, that there was a need to limit the company's leverage to ensure financial flexibility in difficult times, and that "all leading industry analysts" were forecasting a downturn in the petrochemical cycle to begin in 2008 or 2009.

On July 14, 2007, acting pursuant to the Board's authorization and using the inflated projections, Lyondell senior management made their sole due diligence presentation to Blavatnik's representatives, including his Lending Banks.[4]  The SAC alleges that the Board,

> [k]new, or intentionally turned a blind eye, to the
> fact that the 'refreshed' projections of future
> earnings that had been provided to Blavatnik and his
> financing sources on July 14, 2007 grossly
> overstated and inflated the earnings that Lyondell
> could achieve, were not prepared using data derived
> from actual performance, and had in fact been
> fabricated specifically to induce Blavatnik to pay a
> price for Lyondell beyond what a realistic valuation
> would support.

---

[4] The Lending Banks are Citibank, N.A., Goldman Sachs Credit Partners, L.P., and Merrill, Lynch, Pierce, Fenner & Smith Incorporated.

On July 16, 2007, Lyondell's financial advisor Deutsche Bank Securities, Inc. ("Deutsche Bank") made a presentation to the Board finding that the merger was fair to shareholders. Deutsche Bank adopted management's new projections without verification and expressed no view as to their reasonableness.

**July 16, 2007 LBO**

On July 16, 2007, Blavatnik's companies confirmed his proposal in writing.  The deal was structured as a merger of an indirect subsidiary of Basell AF S.C.A. ("Basell") into Lyondell (the "Merger"), with Basell to become the parent of the merged entity under a new name, LyondellBasell Industries AF S.C.A. ("LBI").  Basell had also obtained commitment letters from the Lending Banks.  The Board unanimously voted to approve the Merger on July 16, and the parties signed the merger agreement the same day.  During the Board's meeting, Smith was excused twice to allow the outside directors to discuss the transaction without management being present.

The Merger closed on December 20, 2007.  The LBO was 100% financed by debt secured entirely by Lyondell.  Lyondell took on approximately $21 billion of secured indebtedness in the LBO provided by the Lending Banks, of which $12.5 billion was paid out to Lyondell Shareholders (the "Shareholder Payments").  The Shareholder Payments included approximately $100 million in payments to Lyondell officers and directors.  A further $337.3

million of the Merger proceeds was also paid to Lyondell officers and employees pursuant to various benefit and incentive plans, stock option plans, and other equity-based incentive programs triggered by the change of control of Lyondell. Approximately $7.1 billion of the Merger proceeds went to refinance pre-existing debt of Lyondell, Basell, and certain subsidiaries.  As a result, much of Lyondell's then-existing debt was extinguished.[5]

The SAC alleges that engaging in a leveraged buyout based on false projections left Lyondell inadequately capitalized and put Lyondell's creditors at grave risk.  It alleges that the Board knew the "highly leveraged capital structure that would result from the LBO also was extremely reckless from the perspective of liquidity" and that "as a consequence of the LBO, a bankruptcy or a restructuring could likely occur with the outcome that Lyondell creditors would not be paid."

The Board members received, in aggregate, over $19 million in Merger-related consideration.  Smith received over $100 million, "much of it in the form of LBO-related consideration paid in respect of stock and options issued to him pursuant to various management incentive plans."

---

[5] Blavatnik had committed over $6 billion of his own equity in Basell to the Merger.  LBI entered into debt facilities with the Lending Banks, thereby placing Blavatnik's more than $6 billion in equity in Basell at risk were LBI to default.

The SAC expands on the consideration received by one board member, Stephen J. Chazen, who was also a Senior Executive Vice President of Occidental Petroleum Corporation.  Occidental was one of Lyondell's biggest ethylene customers and held approximately 8.5% of Lyondell's stock in November 2006. Although Chazen had initially challenged Smith's "bogus" earnings projections, Chazen later "stood by silently" and voted with the Board to approve the LBO because Occidental stood to gain $326 million from the sale of Lyondell stock to Blavatnik.

**Lyondell Files for Bankruptcy**

By the end of February 2008, LBI was "fighting for its life," suffering from negative liquidity, lower oil prices, and other adverse developments.[6]  Ultimately, Lyondell filed for chapter 11 protection in January 2009.[7]  <u>In re Lyondell Chem. Co.</u>, No. 09-10023 (Bankr. S.D.N.Y. Jan. 6, 2009).  LBI joined Lyondell as a debtor in the same bankruptcy court three months later along with another Lyondell affiliate.

**Procedural Background**

This action, filed in Bankruptcy Court, is one of four adversary proceedings.  In the first adversary proceeding, filed

---

[6] The Shareholders attribute Lyondell's demise principally to the 2008 financial crisis.

[7] Lyondell filed for bankruptcy along with 78 affiliates.

in July of 2009, the Official Committee of Unsecured Creditors (the "Committee") asserted claims against, among others, Blavatnik and his affiliates, the Lending Banks, and former Lyondell directors and officers ("Blavatnik Action").[8] The claims included constructive and intentional fraudulent transfer claims against these parties under § 548 and state law.[9] In early 2010, the Bankruptcy Court approved a settlement between the Committee and the Lending Banks. The Bankruptcy Court also approved a plan of reorganization for LBI, Lyondell, and its affiliates known as the Lyondell Debtors' Third Amended and Restated Joint Chapter 11 Plan of Reorganization (the "Plan"). The Plan created two trusts, the LB Creditor Trust and the trust at issue here, the LB Litigation Trust. The Lending Banks are beneficiaries for both Trusts. Both Trusts have the same Trustee, Edward S. Weisfelner.

---

[8] Weisfelner v. Blavatnik, No. 09-1375 (Bankr. S.D.N.Y. July 22, 2009).

[9] The Bankruptcy Court dismissed the Trustee's intentional fraudulent transfer counts in the Blavatnik Action on January 4, 2016 for largely the same reasons it dismissed those claims in this action. Blavatnik Action, 543 B.R. 428, 441 (Bankr. S.D.N.Y. 2016); Blavatnik Action, 543 B.R. 417, 423 (Bankr. S.D.N.Y. 2016). While some constructive fraud claims have been dismissed, others remain pending. See Blavatnik Action, Dkt. No. 772 (Bankr. S.D.N.Y. July 20, 2016).

The Trustee has filed three actions.  One pleads federal claims and is the source of the instant appeal; the other two plead state law claims.

In October 2010, the Trustee filed an action on behalf of the LB Creditor Trust, asserting state law intentional and fraudulent transfer claims against a defendant class of former Lyondell shareholders who each received more than $100,000 as Shareholder Payments ("Fund 1 Action").[10]  Recently, as a result of a Court of Appeals decision concerning constructive fraud claims, which is discussed below, the Bankruptcy Court has recommended dismissal of the constructive fraud claims.

On April 23, 2012, the Trustee filed an action against a class of shareholders who each received less than $100,000 as Shareholder Payments ("Reichman Action").[11]  The Reichman Action also asserts intentional and constructive fraudulent transfer claims under state law.  Recently, the Bankruptcy Court recommended dismissal of the constructive fraud claims in that action as well.

On December 23, 2010, the Trustee initiated this action on behalf of the Litigation Trust.  He asserted intentional and

---

[10] Weisfelner v. Fund 1, No. 10-4609 (Bankr. S.D.N.Y. Dec. 1, 2010).

[11] Weisfelner v. Reichman, No. 12-1570 (Bankr. S.D.N.Y. Apr. 26, 2012).

constructive fraudulent transfer claims against the Shareholders
under § 548 of the Bankruptcy Code.[12]  The Trustee voluntarily
dismissed the constructive fraud claim, brought under
§ 548(a)(1)(B), in response to Enron Creditors Recovery Corp. v.
Alfa, S.A.B. de C.V., 651 F.3d 329 (2d Cir. 2011).  Enron held
that payments to redeem commercial paper were "settlement
payments" under 11 U.S.C § 548(e)'s safe-harbor provision and
therefore protected from § 548(a)(1)(B) constructive fraud
claims.  Enron, 651 F.3d at 334-35.  Accordingly, the Trustee
now seeks only to claw back Shareholder Payments pursuant to an
intentional fraudulent transfer claim brought under 11 U.S.C.
§ 548(a)(1)(A).

On January 14, 2014, the Bankruptcy Court granted the
Shareholder defendants' motion to dismiss in the Fund I Action.
The decision, which was made applicable to the Reichman Action
and to this action, was granted without prejudice to the filing
of an amended pleading.  In re Lyondell Chemical Co., 503 B.R.
348 (Bankr. S.D.N.Y. 2014) ("Lyondell I").  The Bankruptcy Court
held that the appropriate standard for imputation was "whether

---

[12] This action seeks recovery of all Shareholder Payments
exclusive of those made to:  (1) the Secured Lender Releasees
and the Settling Defendant Releasees as defined in the Plan; (2)
the non-settling defendants in the Blavatnik Action; and (3) any
individual who served as an officer or employee of the debtors
as of December 15, 2009 that is entitled to a release in
accordance with §§ 11.8(a) or 11.8(b) of the Plan.

the individual whose intent is to be imputed was in a position
to control the disposition of [the transferor's] property." Id.
at 388 (citing In re Roco Corp., 701 F.2d 978, 984 (1st Cir.
1983)).  Based on this ruling, it held that Smith's intent could
not be imputed to Lyondell.  The court reasoned that, since
Delaware law requires that a corporation's board of directors
approve any merger or LBO, it was the intent of Lyondell's Board
and not of Smith that was critical to determine actual intent to
defraud under § 548.  Id. at 386 (citing Del. Code Ann. tit. 8,
§ 251(b)).  The court went on to find that the Trustee had
failed to plead facts "supporting intent to hinder, delay or
defraud on the part of a critical mass of the directors who
[approved the LBO]," or "plausibly suggesting that Smith (who
was only one member of a multi-member Board) or others could
nevertheless control the disposition of [Lyondell's] property."
Id. at 389 (citation omitted).  The Bankruptcy Court also
described the pleadings as "devoid of any allegations of facts
supporting an intention to actually injure creditors . . . , as
contrasted to allegations evidencing an intention on the part of
Lyondell corporate officers to enrich themselves."  Id. at 390.

     The Trustee filed the SAC in this action on April 7, 2014.
Amended complaints were also filed in the Reichman Action and
Fund 1 Action.  The Shareholder defendants renewed their motion
to dismiss the intentional fraudulent conveyance claims in all

three actions soon thereafter.  On November 18, 2015, the
Bankruptcy Court again dismissed the Trustee's § 548(a)(1)(A)
claim, this time with prejudice.  In re Lyondell Chem. Co., 541
B.R. 172, 201-02 (Bankr. S.D.N.Y. 2015) ("Lyondell II").[13]
Observing again that "it was the Board's intent that was
critical" and that Lyondell possessed a "functioning board," the
Bankruptcy Court held that the Trustee had not established "the
intent of a critical mass of Board members who might have that
intent on their own" or that Smith or another, "by reason of the
ability to control them, had caused the critical mass to form
that intent."  Id. at 177 & n.18.  The court made this finding
under various formulations of the "actual intent" standard under
§ 548(a)(1)(A), finding "no allegations supporting an inference
that any of the Board members other than Smith and Chazen had
any wrongful intent of any type," nor that "Smith's and Chazen's
satisfactorily pleaded dishonesty and greed was accompanied by
an actual intent that creditors not be paid, or that they be
otherwise hindered in their debt recovery efforts."  Id. at 192.

The Trustee filed this appeal on January 22, 2016,
challenging the Bankruptcy Court's dismissal of its
§ 548(a)(1)(A) claim on two grounds: that the Bankruptcy Court
erred by (1) ruling that the Trustee did not adequately allege

---

[13] Lyondell II was issued in the Fund I Action, Reichman Action,
and this action.

that Lyondell incurred debt and transferred the Shareholder Payments with "actual intent" to hinder, delay or defraud its creditors; and (2) ruling that the knowledge, conduct and intent of Lyondell's CEO and Chairman and other members of Lyondell management in connection with the Shareholder Transfers may not be imputed to Lyondell.  The appeal became fully submitted on April 29.

**DISCUSSION**

The standard of review for matters within core bankruptcy jurisdiction is set forth in the Federal Rules of Bankruptcy Procedure.  Fed. R. Bankr. P. 7052, 8013.  On appeal, a district court reviews the bankruptcy court decision "independently," accepting its "factual findings unless clearly erroneous but review[ing] its conclusions of law de novo."  In re Johns-Manville Corp., 759 F.3d 206, 214 (2d Cir. 2014) (citation omitted).  Here, the appeal brings legal challenges to the lower court's rulings on a motion to dismiss and these rulings are therefore reviewed de novo.

Before addressing the two legal issues presented on this appeal -- whether the CEO's intent may be imputed to Lyondell, and what showing is required to plead actual intent -- it is helpful to place the federal claim of intentional fraudulent conveyance into context.  That context is provided by the

Bankruptcy Code and its sections addressing the avoidance of pre-bankruptcy transfers.

The Bankruptcy Code contains two independent fraudulent transfer claims: one for an intentional fraudulent transfer, another for constructive fraudulent transfers.  11 U.S.C. § 548(a)(1).  Under § 548(a)(1)(A), the intentional fraudulent conveyance statute, a trustee

> may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; . . .

11 U.S.C. § 548(a)(1)(A) (emphasis added).  In contrast, under § 548(a)(1)(B), the constructive fraudulent conveyance statute, a trustee may avoid a transfer if the debtor

> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

The Code's bifurcated approach to fraudulent conveyance claims has its origins in centuries-old English common law dating back to the Statute of Elizabeth of 1571.  The Statute provided for the avoidance and punishment of transfers made "to the end, purpose and intent, to delay, hinder, or defraud creditors."  13 Eliz., ch. 5, § 1 (1571) (Eng.); see also Eberhard v. Marcu, 530 F.3d 122, 129-30 (2d Cir. 2008) (describing the Statute of Elizabeth).  Recognizing that actual intent under the Statute was difficult to prove, early English courts developed badges of fraud that could be used to prove intent, such as the general transfer of all assets and transfers made in secret.  See Twyne's Case, 76 Eng. Rep. 809, 812-14 (Star Chamber 1601); see also Samir D. Parikh, Saving Fraudulent Transfer Law, 86 Am. Bankr. L.J. 305, 316 (2012); Barry L. Zaretsky, Fraudulent Transfer Law as the Arbiter of Unreasonable Risk, 46 S.C. L. Rev. 1165, 1168-71 (1995).

With its first bankruptcy laws, the United States adopted a fraudulent conveyance statute.  Bankruptcy Act of 1800, ch. 19, § 17, 2 Stat. 19, 26 (repealed 1803).  Policymakers and courts quickly recognized that intentional fraudulent transfer claims,

even when supported by a badges-of-fraud analysis, were challenging to bring due to their demanding intent requirement and did not cover all conveyances that harmed creditors.  See, e.g., Boyd v. Dunlap, 1 Johns. Ch. 478, 482 (N.Y. Ch. 1815); see also Parikh, 86 Am. Bankr. L.J. at 316 (citation omitted); Zaretsky, 46 S.C. L. Rev. at 1171.  Accordingly, the creation of a "constructive fraud" claim became the centerpiece of the Uniform Fraudulent Conveyance Act ("UFCA") of 1918.  The UFCA was drafted to address "uncertainties of the existing law . . . [particularly] the attempt to make the Statute of Elizabeth cover all conveyances which wrong[ed] creditors, even though the actual intent to defraud [did] not exist."  UFCA, 7A U.L.A. 427, 428 (1918) (Prefatory Note).

The UFCA provided a bifurcated approach to fraudulent conveyance claims.  It retained the traditional intentional fraudulent conveyance claim, but provided that such transfers must be "made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors."  UFCA § 7, 7A U.L.A. at 509 (emphasis added).  But, it also specified certain transactions that could constitute a constructive fraudulent conveyance "without regard to . . . actual intent."  UFCA § 4, 7A U.L.A. at 474.

Thirty years later, in 1938, the language of the UFCA was codified in § 67d of the Bankruptcy Act.  Chandler Act Amendments, ch. 575, § 67d, 52 Stat. 840, 877-78 (1938) (repealed 1978).  In 1978, Congress repealed the Bankruptcy Act and replaced it with the Bankruptcy Code.  Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978).  This change replaced § 67(d) of the Act with § 548 of the Code with few substantive changes.  The modernization of fraudulent transfer claims is also reflected in the Uniform Fraudulent Transfers Act ("UFTA") promulgated in 1984, which retains the distinction between intentional and constructive fraud.  UFTA, 7A U.L.A. 639, 639-42 (1984).

Congress, however, has placed limits on the types of transfers that can be avoided through a constructive fraud claim.  A limitation of significance to this appeal is the safe harbor for securities transactions.  11 U.S.C. 546(e) provides:

> Notwithstanding section[] . . . 548(a)(1)(B) . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a . . . stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract . . . except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).  This limitation on avoidance of pre-bankruptcy transfers that occurred "in connection with a

securities contract" does not apply to intentional fraudulent transfer claims.  Id.

Congress enacted the § 546(e) safe harbor "to minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."  Enron, 651 F.3d at 334 (quoting H.R. Rep. No. 97-420, at 2 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 583).  Indeed, "[i]f a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk."  Id.  "By restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor stands at the intersection of two important national legislative policies on a collision course -- the policies of bankruptcy and securities law."  Id. (citation omitted).  Accordingly, the Second Circuit has broadly held that the term "settlement payment" refers to any kind of payment that "complete[s] a transaction in securities."  Id. at 336.

Recently, the Second Circuit held that the scope of the § 546(e) safe harbor extends to state law constructive fraud claims.  In re Tribune Co. Fraudulent Conveyance Litig., 818 F.3d 98 (2d Cir. 2016).  In Tribune, the Second Circuit

concluded that state law constructive fraudulent transfer claims brought by creditors against the debtor's former shareholders to recover amounts they received in connection with an LBO were preempted by § 546(e).  Id. at 109-12, 124.  It explained that "Section 546(e)'s language clearly covers payments . . . by commercial firms to financial intermediaries to purchase shares from the firm's shareholders," and rejected the proposition that § 546(e) does not apply "when monetary damages are sought only from shareholders, or an LBO is involved."  Id. at 120 (citation omitted).

In response to the Tribune decision, the Bankruptcy Court in the Fund 1 Action and Reichman Action recently issued an order suggesting that all state constructive fraud claims from those adversary proceedings must be dismissed.  Reichman Action, Dkt. No. 118 (Bankr. S.D.N.Y. July 20, 2016); Fund 1 Action, Dkt. No. 2414 (Bankr. S.D.N.Y. July 20, 2016).  As noted above, the claim for constructive fraudulent transfer contained in the adversary proceeding at issue in this appeal had already been dismissed.

## I.   **Imputation**

Against this backdrop, it is appropriate to turn to the first issue on appeal:  under what circumstances may Smith's knowledge and intent be imputed to Lyondell.  State law supplies the governing law principles for assessing the imputation of a

corporate officer's intent to a corporation for purposes of § 548.  See O'Melveny & Myers v. F.D.I.C., 512 U.S. 79, 83 (1994).  Lyondell is a Delaware corporation and engaged in the Merger pursuant to Delaware law.  Accordingly, Delaware's law of imputation governs.  Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998) (under New York's interest analysis, courts apply "the law of the jurisdiction having the greatest interest in the litigation"); Hart v. Gen. Motors Corp., 517 N.Y.S.2d 490, 492 (1st Dep't 1987) ("[T]he issue of corporate governance . . . is governed by the law of the state in which the corporation is chartered, in this case, Delaware.").

"[A] basic tenet of [Delaware] corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself."  Stewart v. Wilmington Trust SP Servs., Inc., 112 A.3d 271, 302-03 (Del. Ch. 2015).  Delaware courts, therefore, adhere to the "general rule of imputation" and hold a corporation liable for the acts and knowledge of its agents "even when the agent acts fraudulently or causes injury to third persons through illegal conduct."  Id. at 303.  While "it may appear harsh to hold an 'innocent' corporation (and, ultimately, its stockholders) to answer for the bad acts of its agents, such corporate liability is essential to the continued tolerance of

23

the corporate form, as any other result would lack integrity."
Id. (citation omitted).  The primary justification for the
imputation doctrine is to create "strong incentives for
principals to design and implement effective systems through
which agents handle and report information."  Hecksher v.
Fairwinds Baptist Church, Inc., 115 A.3d 1187, 1205 (Del. 2015)
(quoting Restatement (Third) of Agency § 5.03, cmt. b (2006)).
These principles of Delaware law are consistent with the law of
imputation found in other jurisdictions as well.  See, e.g.,
Kirschner v. KPMG LLP, 15 N.Y.3d 446, 465-66 (2010) (deriving
the same rule from general agency principles); McNamara v. PFS
(In re The Personal and Bus. Ins. Agency), 334 F.3d 239, 243 (3d
Cir. 2003) (for a § 548(a)(1)(A) claim, "the fraud of an officer
of a corporation is imputed to the corporation when the
officer's fraudulent conduct was (1) in the course of his
employment, and (2) for the benefit of the corporation."
(citation omitted)).

     Accordingly, "[a]n employee's knowledge can be imputed to
her employer if she becomes aware of the knowledge while she is
in the scope of employment, her knowledge pertains to her duties
as an employee, and she has the authority to act on the
knowledge."  Hecksher, 115 A.3d at 1200-01 (citation omitted).
To determine whether conduct is within the scope of employment,
Delaware courts consider the factors outlined in the Restatement

24

(Second) of Agency, which provides that an act is within the scope of employment if:

> (1) it is of the kind he is employed to perform; (2) it occurs within the authorized time and space limits; (3) it is activated, in part at least, by a purpose to serve the master; and (4) if force is used, the use of force is not unexpectable by the master.

Id. at 1200 (quoting Restatement (Second) of Agency § 228 (1958)).  "[T]he relevant test . . . is not whether the wrongful act was within the ordinary course of business of the [employer], . . . but whether the service itself in which the tortious act was done was within the ordinary course of such business."  Id. (citation omitted).  Moreover, where "an employee has a duty to disclose information but fails to do so, the law assumes that the employer was aware of the information to the same extent as the employee."  Id. at 1201 n.52 (citing Restatement (Second) of Agency § 275 (1958)).[14]

In assessing whether an act falls within the scope of employment, it is important to remember that a corporation can act only through its agents.  "When corporate officers carry out the everyday activities central to any company's operation and

---

[14] The intent of an agent may not be imputed, however, "when the corporate agent responsible for the wrongdoing was acting solely to advance his own personal financial interest, rather than that of the corporation itself."  Stewart, 112 A.3d at 303.  This exception, known as the adverse interest doctrine, has not been relied upon by the parties here.

well-being -- such as issuing financial statements, accessing
capital markets, . . . moving assets between corporate entities,
and entering into contracts -- their conduct falls within the
scope of their corporate authority." Kirschner, 15 N.Y.3d at
465-66 (general agency law); see also Baena v. KPMG LLP, 453
F.3d 1, 7 (1st Cir. 2006) ("The approval and oversight of
[financial] statements is an ordinary function of management
that is done on the company's behalf, which is typically enough
to attribute management's actions to the company itself.").

     Smith's knowledge and intent in connection with the LBO may
be imputed to Lyondell.  The parties do not dispute that as the
CEO of Lyondell, Smith was an agent of the company.  His
supervision of the preparation of EBITDA projections as well as
his presentation of those projections to the Board were done
pursuant to his duties as CEO and Chairman of the Board.
Similarly, his negotiations with Blavatnik were duties performed
by an officer on behalf of a corporation.  The Shareholders do
not contend otherwise.  Accordingly, Smith's alleged knowledge
that the EBITDA figures were fraudulent, as well as his intent
in creating and presenting them, can be imputed to Lyondell.
See, e.g., Stewart, 112 A.3d at 308 (imputing to a corporation
the creation of fraudulent financial contracts); Kirschner, 15
N.Y.3d at 465-69 (imputing to a corporation the fraud of

26

corporate officers who presented a false financial picture of the corporation).

The Bankruptcy Court's holding to the contrary -- that Smith's intent may be imputed to Lyondell only if the Trustee adequately pleads that Smith was in a position to control the Board's decision to proceed with the LBO -- is incorrect.  The Bankruptcy Court held that since only a board may approve a merger under Delaware law, and Lyondell possessed what the court termed a "functioning board," Smith's intent could not be imputed to the Board unless the Trustee could establish that Smith "by reason of the ability to control [the Board], had caused the critical mass [of Board members] to form" the requisite intent.  Lyondell II, 541 B.R. at 177 & n.18.  The distinction between a functioning board and a closely held corporation without a functioning board, id. at 177 n.18, and the requirement that the Trustee demonstrate Smith's control over the Lyondell Board, do not appear to have any basis in Delaware agency law.  Nor have the Bankruptcy Court or the Shareholders cited any authority for the proposition that a corporate officer's knowledge and intent may not be imputed to the corporation when the corporation's board must vote on the decision at issue.  Compare Stewart, 112 A.3d at 286 (board approved audited financials built upon officer's fraudulent documents).  Thus there is no basis to infer, based on the fact

27

that the LBO required the approval of the Board, that long established agency law principles should be altered.

To support its holding that the Trustee was required to plead that Smith controlled the Board in order to impute Smith's knowledge and intent to the corporation, the Bankruptcy Court relied on inapposite law.  The Bankruptcy Court and the Shareholders rely on cases that address the circumstances in which the knowledge of the entity receiving corporate assets, that is, the transferee, may be imputed to the transferor-corporation.  They rely principally on In re Roco Corp., 701 F.2d 978 (1st Cir. 1983), which affirmed a finding that a transfer of funds from a corporation to a natural person was an intentional fraudulent transfer.  Roco held that "[w]e may impute any fraudulent intent of [the transferee] to the transferor Roco because, as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property."  Id. at 984.  Roco, however, did not address the general rule under Delaware agency law that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself.  Thus, Roco did not reject agency principles regarding imputation or purport to state that the intent of corporate agents may be imputed to a corporation

only when the agent also holds complete and formal authority over the assets.

Roco is entirely consistent other decisions addressing the question of imputation in the context of transfers from a corporation to a third-party transferee.  In such situations, the imputation of the transferee's intent to the corporate debtor-transferor under § 548(a)(1)(A) requires actual control of the debtor.  In re Lehman Bros. Holdings Inc., 541 B.R. 551, 576 (S.D.N.Y. 2015); American Tissue, Inc. v. DLJ Merch. Banking Partners, II, L.P., No. 03cv6913 (GEL), 2006 WL 1084392, at *4-*6 (S.D.N.Y. Apr. 20, 2006); see also In re Adler, Coleman Clearing Corp., 263 B.R. 406, 442-43 (S.D.N.Y. 2001).  Thus, the doctrine upon which the Shareholders rely is based on the imputation of a transferee's intent, not an agent's intent.  In re Adler, 263 B.R. at 442-43, 453-54 (articulating different imputation standards for transferees and agents).  Accordingly, to impute Smith's knowledge and intent to the Lyondell, the Trustee need not plead that Smith had the power to effectuate the Merger or dominated the Board.

In sum, Smith's knowledge and intent may be imputed to Lyondell.  The Trustee asserts that when Lyondell conveyed the Shareholder Payments, it did so with an intent to defraud Lyondell creditors.  He seeks to impute Smith's knowledge and intent to the corporation.  This is entirely consistent with

Delaware agency law.  See Hecksher, 115 A.3d at 1200-05
(imputing knowledge and conduct of a school employee who failed
to report the sexual abuse of a student to the school under
general agency principles).  As explained in Stewart, "the
practice of imputing officers' and directors' knowledge to the
corporation means that, as a general rule, when these actors
engage in wrongdoing, the corporation itself is a wrongdoer."
112 A.3d at 303.  In Stewart, the knowledge of the company's
president -- that audited financial statements were built upon
the fraudulent documents he had prepared -- was imputed to the
Board in connection with its approval of those statements.  Id.
at 286-89, 308.

## II.  **Lyondell's Actual Intent**

Since Smith's knowledge and intent may be imputed to
Lyondell, the adequacy of the pleading of Lyondell's actual
intent to defraud creditors under § 548(a)(1)(A) must be
reconsidered.  The parties dispute what constitutes "actual
intent" to defraud creditors under § 548(a)(1)(A), and dispute
what standard must be applied to assess the adequacy of the
pleading of actual intent.[15]

---

[15] The Bankruptcy Court collapsed its discussion of the actual
intent element with its discussion of the standard for pleading
a plausible claim that an actual intent to defraud creditors
existed.  This Opinion distinguishes between the two issues.

As recited above, § 548(a)(1)(A) allows a trustee to avoid a transfer where he demonstrates "actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A).  The debtor's actual intent to defraud "need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor."  In re Bayou Grp., LLC, 439 B.R. 284, 304 (S.D.N.Y. 2010); see also 5 Collier on Bankruptcy ¶ 548.04[1] (16th ed. 2016).  The intent must be "something more than just an intent to prefer one creditor over another."  In re Lehman Bros. Holdings Inc., 541 B.R. at 575 (citation omitted).  In other words, "the debtor must have had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends."  Id. (citation omitted).

An actual intent to defraud, hinder, or delay may not be presumed.  The qualifier "actual" must be given meaning, as "[i]t is our duty to give effect, if possible, to every clause and word of a statute."  United States v. Rowland, --- F.3d. ---, 2016 WL 3361542, at *4 (2d Cir. June 17, 2016) (citation omitted).[16]  The Honorable Learned Hand provided a description of

---

[16] New York's intentional fraudulent conveyance statute also requires "actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud."  N.Y. Debt. & Cred. Law § 276.

31

intent while reviewing the substantially similar formulation in
a predecessor bankruptcy statute, the Bankruptcy Act of 1898,
ch. 541, § 3, 30 Stat. 544, 546 (repealed 1978).  The Act
required a showing of "intent to hinder, delay, or defraud"
creditors.  Id.  Judge Hand explained that

> [T]here must be proof in some form of an actual
> intent, as distinct from the knowledge of the facts
> from which the consequences of the debtor's act will
> arise.  That means only this:  That although, in
> general, civil responsibility is imputed to a man
> for the usual results of his conduct, regardless of
> whether in the instance under consideration he
> actually had those consequences in mind, in specific
> cases like this, the law requires proof of that
> added element, his mental apprehension of those
> consequences, before it attaches to his conduct the
> result in question.

In re Condon, 198 F. 947, 950 (S.D.N.Y. 1912) (citing Coder v.
Artz, 213 U.S. 223 (1909)) (emphasis added).

Judge Hand's requirement of a "mental apprehension" of the
consequences of a debtor's act remains in use today.  See, e.g.,
In re Jeffrey Bigelow Design Grp., Inc., 956 F.2d 479, 484 (4th
Cir. 1992) ("[A]ctual fraudulent intent requires a subjective
evaluation of the debtor's motive.").  In describing "actual
intent," courts frequently rely on the substantially similar
formulation contained in the Restatement (Second) of Torts.
See, e.g., In re Manhattan Inv. Fund Ltd., 397 B.R. 1, 12 n.16
(S.D.N.Y. 2007) (knowledge to a "substantial certainty"
constitutes actual intent); 5 Collier on Bankruptcy

¶ 548.04[1][a].  The Restatement notes that "[t]he word 'intent' is used . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second) of Torts § 8A (emphasis added); cf. United States v. Rivernider, --- F.3d ---, 2016 WL 3632496, at *6 (2d Cir. July 7, 2016) (proof of fraudulent intent under criminal wire fraud statute requires proof that the defendant "contemplate" some actual harm or injury to the victims.).

The Trustee argues for a lower standard of proof of an actual intent to defraud.  Relying on In re Sentinel Mgmt. Grp., Inc., 728 F.3d 660 (7th Cir. 2013), the Trustee contends that proof of a desire to cause harm or a belief that such harm is substantially certain to occur is unnecessary because debtors are presumed to intend the "natural consequences" of their actions.  The Sentinel decision does not provide a sound basis to abandon Judge Hand's formulation or reject the Restatement's equivalent formulation.

In Sentinel, the lower court had dismissed the plaintiff's § 548(a)(1)(A) claim by finding that Sentinel, an investment manager, had acted with a desire to stay in business, not a desire to hinder, delay, or defraud creditors.  Id. at 667.  The court focused exclusively on the company's motives rather than on its knowledge or appreciation of the consequence of its acts.

33

The Seventh Circuit reversed and observed that, while Sentinel's "primary purpose may not have been to render the funds permanently unavailable to [creditors] . . . [it] certainly should have seen this result as a natural consequence of its actions.  In our legal system, every person is presumed to intend the natural consequences of his acts."  Id. (citation omitted).  In Sentinel, the debtor had pooled and borrowed against customer funds that federal law required it to keep segregated and forbid it to use for its own purposes.  Id. at 668.  The court concluded that, "even if Sentinel did not intend to harm its [] clients," its actions violated the law and demonstrated an actual intent to defraud.  Id.  Sentinel principally addressed, therefore, the distinction between one's motive and one's appreciation of the consequences of one's acts.  Given that emphasis, Sentinel should not be read as replacing the traditional, more demanding standard for ascribing actual intent with a presumption that a person is aware of the natural consequences of her acts.[17]

----

[17] Since a person's intent is rarely subject to direct proof and may be shown through circumstantial evidence, In re Kaiser, 722 F.2d 1574, 1582 (2d Cir. 1983), proof of the natural consequences of one acts may serve as circumstantial evidence that one appreciated those consequences.  Nonetheless, the fact finder is required to find, based on all of the direct and circumstantial evidence, that the debtor did form an actual intent to defraud creditors, as that standard was described by Judge Hand or as intent is described in the Restatement (Second) of Torts.

The parties next grapple with the standard that should be applied on a motion to dismiss an intentional fraudulent conveyance claim.  The ordinary standards under Rules 12(b)(6) and 9(b) govern.

Rule 12(b)(6), Fed. R. Civ. P., is applicable to this proceeding pursuant to Rule 7012(b), Fed. R. Bankr. P.  Under Rule 12(b)(6), a court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  Loginovskaya v. Batratchenko, 764 F.3d 266, 269-70 (2d Cir. 2014).  "To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief."  Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 68 (2d Cir. 2014); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation omitted)).  A claim has facial plausibility when "the factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

Because a § 548(a)(1)(A) claim sounds in fraud, the SAC must also satisfy the heightened pleading standards of Rule 9(b), Fed. R. Civ. P., made applicable to bankruptcy proceedings

35

by Rule 7009, Fed. R. Bankr. P.  See, e.g, In re Sharp Int'l
Corp., 403 F.3d 43, 56 (2d Cir. 2005) (applying Rule 9(b) to New
York state intentional fraudulent conveyance statute).  Under
Rule 9(b), "though mental states may be pleaded generally,
Plaintiffs must nonetheless allege facts that give rise to a
strong inference of fraudulent intent." Loreley Fin. (Jersey)
No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 171 (2d Cir.
2015) (citation omitted).  A "strong inference" of fraud may be
established by alleging facts showing either (1) a "motive and
opportunity to commit the fraud"; or (2) "strong circumstantial
evidence of conscious misbehavior or recklessness." Employees'
Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d
297, 306 (2d Cir. 2015) (securities law); see also Adelphia
Recovery Trust v. Bank of Am., N.A., 624 F. Supp. 2d 292, 308
(S.D.N.Y. 2009) (applying "motive and opportunity" test to the
pleading of a § 548 claim).  A complaint will survive "if a
reasonable person would deem the inference of scienter cogent
and at least as compelling as any opposing inference one could
draw from the facts alleged." Blanford, 794 F.3d at 306 (citing
Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324
(2007)).

    "Due to the difficulty of proving actual intent to hinder,
delay, or defraud creditors, the pleader is allowed to rely on
'badges of fraud' to support his case." In re Sharp Int'l

36

Corp., 403 F.3d at 56 (badges applied to pleading of state law claim of intentional fraudulent conveyance); see also In re Kaiser, 722 F.2d at 1582 (badges applied in finding actual fraud).  These "badges of fraud" include

    (1)  the transfer or obligation was to an insider;

    (2)  the debtor retained possession or control of the property transferred after the transfer;

    (3)  the transfer or obligation was disclosed or concealed;

    (4)  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (5)  the transfer was of substantially all the debtor's assets;

    (6)  the debtor absconded;

    (7)  the debtor removed or concealed assets;

    (8)  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    (9)  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

    (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

UFTA § 4, 7A U.L.A. at 653; see also 5 Collier on Bankruptcy
¶ 548.04[1].[18]  While "[t]he presence of a single badge of fraud
may spur mere suspicion, the confluence of several can
constitute conclusive evidence of an actual intent to defraud,
absent 'significantly clear' evidence of a legitimate
supervening purpose." Max Sugarman Funeral Home, Inc. v. A.D.B.
Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991) (citation
omitted).

The Bankruptcy Court concluded that the Trustee had failed
to plead either that Smith controlled the Board or that a
critical mass of the Board had formed the actual intent to
defraud Lyondell's creditors.  Lyondell II, 541 B.R. at 191-93.
As a consequence, he dismissed the intentional fraudulent
conveyance claim.  Among other things, he observed that the
complaint fell short of alleging that the Board members "knew
the projections were fraudulent."  Id. at 196.  Instead, it only
alleged that the Board accepted the projections regarding
Lyondell's EBITDA "without sufficient scrutiny" and "with
insufficient attention to the 'foreseeable risk' that after
incurring so much debt, Lyondell could not pay its creditors
back."  Id.

---

[18] The Bankruptcy Court relied on this set of factors, which it
took from the Texas version of the UFTA.  Lyondell II, 541 B.R.
at 186-87.

Because the Bankruptcy Court failed to impute Smith's knowledge and intent to Lyondell, it did not complete the appropriate analysis and determine whether a claim of intentional fraudulent inducement had been adequately pled once Smith's knowledge and intent were imputed to the corporation. Nonetheless, it made several observations that remain relevant.

The Bankruptcy Court found that the pleadings adequately stated that Smith and his management team had a motive to commit fraud with the intention of "secur[ing] a variety of benefits to themselves . . . which would result from" the LBO. Lyondell I, 503 B.R. at 390.  It found that the SAC adequately pled Smith's intent to defraud Blavatnik and the Lending Banks through use of the fraudulent projections.  Lyondell II, 541 B.R. at 193.  It found three badges of fraud had been pleaded.  They were that the transfer was of substantially all of the debtor's assets, since a "very large proportion of Lyondell assets" became subject to liens; that the transfer was to an insider in the sense that directors received "large" cash payments, albeit cash payments that were only a relatively small component of a much larger transaction; and that the debtor became insolvent shortly after the transfer.  Id. at 193 n.98.  And, it found that the participation of the sophisticated Lenders did not make implausible the allegation that the LBO was undertaken with knowledge that creditors would be defrauded.  Lyondell I, 503

B.R. at 391.  The Bankruptcy Court reasoned:  "In light of the fees and other benefits associated with financing the LBO, and the obvious fact that, in the absence of avoidance, secured creditors would be paid before unsecured creditors would realize anything, the Creditor Trust's allegations are not implausible." Id.

Given this record, and the parties' extensive briefing, it is appropriate to complete an analysis that imputes Smith's intent and knowledge to Lyondell.  See, e.g., Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (finding complaint stated a claim after district court improperly considered materials outside the pleadings when dismissing the claim); cf. Schneider v. Kingdom of Thailand, 688 F.3d 68, 72 (2d Cir. 2012) (appeals court had "the power to decide cases . . . if the facts in the record adequately support the proper result.").

The Trustee has adequately pleaded a claim that Lyondell engaged in an intentional fraudulent transfer of its assets through the LBO.  He has pleaded facts sufficient to create a strong inference that Smith acted with actual intent to hinder, delay and defraud Lyondell's creditors.  Under well-established agency principles, Smith's intent may be imputed to Lyondell.

The Trustee has pled sufficient facts to support the following allegations.  In reaction to knowledge that Blavatnik wished to take over Lyondell, Smith created in the Fall of 2006

40

an extremely aggressive five year forecast of Lyondell's operations.  Then, as the takeover process heated up in mid-2007, Smith caused those aggressive projections to be "refreshed."  This created, without any careful analysis or justification, a grossly overstated set of projections.  Smith knew that the refreshed projections were materially inflated and unjustified, but presented them to the Lyondell Board and caused them to be presented to Blavatnik's representatives and to the Lender Banks.  Because of the pace of the July 2007 takeover negotiations, there was no opportunity for appropriate due diligence, none was done, and the falsified numbers were relied upon by each of the decision-makers, just as Smith intended they would be.

The takeover occurred at $48 per share, which reflected a substantial premium over both Blavatnik's initial bid of $28.50 in the Fall of 2006, and his early July 2007 offer of $40 per share.  With the completion of the LBO, officers, directors, and shareholders received substantial payouts.  Lyondell's then-existing creditors were largely paid off, but the LBO created an enormous new debt burden for Lyondell.

Because the majority of Lyondell's assets were subject to liens after the LBO, the LBO had the effect of essentially stripping Lyondell of its assets.  Smith knew from the Spring of 2007 that Lyondell was underperforming its "unrefreshed" 2007

41

projections and that Lyondell's debt burden would deprive it of
the flexibility it needed to face the challenging business and
financial conditions it was experiencing.  Accordingly, the
Trustee has pleaded sufficient facts from which it can properly
be inferred that Smith not only recklessly disregarded the
likelihood that the LBO would quite quickly injure creditors,
but also contemplated and believed that Lyondell would default
on its obligations to its creditors within a very short period
of time.  And, indeed, that is precisely what happened.
Lyondell filed for bankruptcy roughly a year after the LBO.
Smith had forecast this very outcome at the Las Vegas conference
in the May of 2007.  Acknowledging that a leveraged buyout would
help shareholders, he warned that it would not enrich
bondholders:  "If you think you are going to have a down cycle
in the chemical markets, I don't think you want to add $8
billion, $10 billion debt to this and live through that."

        Of course, these are just allegations, and the allegations
have been taken as true, as they must be at this stage of the
litigation.  While these allegations create a plausible
inference of an actual intent to defraud creditors, it remains
to be seen if the Trustee can prevail at trial.

        The Shareholders provide a set of factual contentions to
counter the SAC's allegations that Smith acted with knowledge
that Lyondell would become insolvent.  These representations

include that Lyondell took comfort in the participation of the
Lending Banks, that Blavatnik was a wealthy investor who
provided much of his own capital to the Merger, that Blavatnik
made his $48 offer before seeing Smith's refreshed projections,
that Smith's May 2007 warning about the impact of an LBO on
creditors is being taken out of context, that much of Lyondell's
then-existing debt was paid off in the Merger, that it was the
2008 financial crisis that caused Lyondell's demise, and that
neither Smith nor Lyondell could have foreseen that crisis much
less anticipated its impact on Lyondell.  These contentions, and
the inferences to be drawn from them, create factual disputes
that may not be resolved on a motion to dismiss.  Taken
individually or collectively they do not render the pleaded
claim of an intentional fraudulent transfer implausible.

<u>**CONCLUSION**</u>

The Bankruptcy Court's November 18, 2015 decision is
reversed.  The intentional fraudulent conveyance claim is
reinstated.  This case is remanded for further proceedings.

Dated:   New York, New York
         July 27, 2016

_____
DENISE COTE
United States District Judge

43